IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 8, 2005 Session

## STATE OF TENNESSEE v. ROBERTO VASQUES, LUIS D. VIDALES ROMERO, KEVIN JOEL HERNANDEZ, LUIS MARTIN VASQUEZ, HECTOR ALONZO, AND VICTOR HUGO GARZA

**Appeal from the Criminal Court for Davidson County**
**No. 2000-D-1876     J. Randall Wyatt, Jr., Judge**

---

**No. M2004-00166-CCA-R3-CD - Filed October 7, 2005**

---

A Davidson County Criminal Court jury convicted the defendants of conspiracy to possess with intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone, a Class A felony, and the trial court sentenced each of them to fifteen years confinement at one hundred percent in the Department of Correction. The defendants appealed their convictions, with various defendants claiming that the evidence was insufficient, that the Tennessee Drug Free School Zone Act was unconstitutional, that the trial court erred in instructing the jury, that the state's continued reference to the defendants' ethnicity was overly prejudicial, that the state's introduction of evidence concerning the presence of weapons was irrelevant and overly prejudicial, and that the jury's verdict lacked unanimity. However, before oral argument, this court stayed the appellate proceedings based upon the defendants filing petitions for coram nobis relief in the trial court. The trial court thereafter granted the petitions for coram nobis relief and vacated the defendants' convictions, and the state now appeals, claiming the trial court improperly granted coram nobis relief to each defendant. In these consolidated cases, we affirm the trial court's coram nobis judgment as to the defendants Luis Vasquez and Victor Garza but reverse the judgment as to the other defendants. On direct appeal of the underlying convictions, we hold the trial court erred in not instructing the jury about facilitation but that the error did not affect a substantial right of Roberto Vasques, Luis D. Vidales Romero, Kevin Joel Hernandez, or Hector Alonzo, and we affirm their convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, Case Remanded**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Paul G. Summers, Attorney General and Reporter; Richard H. Dunavant, Assistant Attorney General, Victor S. (Torry) Johnson, III, District Attorney General; and John C. Zimmerman, Assistant District Attorney General, for the appellant, State of Tennessee.

Jerry Gonzalez, Nashville, Tennessee, for the appellee, Roberto Vasques; C. LeAnn Smith, Nashville, Tennessee, for the appellee, Luis D. Vidales Romero; James O. Martin, III, Nashville, Tennessee, for the appellee, Kevin Joel Hernandez; John G. Oliva, Nashville, Tennessee, for the appellee, Luis Martin Vasquez; David M. Hopkins, Nashville, Tennessee, for the appellee, Hector Alonzo; and Dwight E. Scott, Nashville, Tennessee, for the appellee, Victor Hugo Garza.

**OPINION**

This case relates to an undercover drug sting operation conducted by the Tennessee Bureau of Investigation ("TBI") and the Metropolitan Nashville Police Department which culminated in the arrest and conviction of the defendants. After the trial and motion for new trial hearing, the state informed the defendants and the trial court that during the investigation and trial of the defendants, one of the lead investigators in the case, TBI Agent Patrick Howell, had been using cocaine which he stole from evidence collected in other criminal cases. Based upon this new information, the trial court granted the defendants' petitions for writs of error coram nobis and vacated the defendants' convictions.

THE TRIAL

At the trial, Metropolitan Police Department Detective Jessie Birchwell testified that on April 18, 2000, he assisted in an investigation which resulted in the arrest of Jose Rodriguez. He said Rodriguez was arrested on drug charges and agreed to help law enforcement arrest his supplier. Detective Birchwell said Rodriguez identified two houses located at 1147 and 1035 Antioch Pike where his supplier's operation was based. Detective Birchwell said that a phone call was made to the supplier, David, and that a meeting was set up to buy one hundred pounds of marijuana on April 19.

Detective Birchwell testified that on April 19, he and approximately fourteen other narcotics officers established surveillance on both houses and the meeting place, a carwash located at 3004 Nolensville Road. He said he saw two men in a white Toyota Camry drive into the carwash. He said the Camry was driven by a man wearing a white football jersey who left the Camry and entered the informant's car. He said David was later identified as the defendant Luis David Romero. He said that at the same time, a gray van was parked in one of the carwash bays and that one of the men in the van appeared to be talking on a radio. He said he thought that the man was talking on a radio because he held it in front of his mouth instead of to his ear like a cell phone. He said that a short time later, the man in the jersey exited the informant's car and drove away in the white Camry but that the gray van remained at the carwash. He said he was told that the suspects in the Camry were going to get the marijuana.

Detective Birchwell said that approximately thirty to forty-five minutes later, the white Camry returned followed by a white Ford Taurus and a black Pontiac Firebird. He said that the Camry and the Taurus pulled into the carwash but that the Firebird did not. He said the Firebird instead pulled into the Dairy Queen next door to the car wash and reappeared later at Burger King,

-2-

which was located next to the Dairy Queen with portions of its parking lot having an unobstructed view of the carwash. He said three male Hispanics were in the Taurus, two in the Camry, and two in the Firebird.[1]

Detective Birchwell said that when he was given the "take down" signal by the officer who was monitoring the informant's conversation, he pulled into the car wash and got out of the car. He said the man in the jersey fled. He said that he helped Metropolitan Police Officer Gene Donnegan pursue the suspect and that when they caught the suspect, a nine millimeter, semi-automatic handgun was found in his front waistband. Detective Birchwell identified the suspect he and Officer Donnegan pursued as the defendant, Luis David Romero. He said that after Romero was secured, he returned to the Camry where another suspect was still sitting. He said that in the Camry he found a loaded .45 caliber, semi-automatic handgun and a walkie-talkie. Officer Birchwell identified the passenger of the Camry as the defendant, Kevin Hernandez.

Detective Birchwell testified that after securing Hernandez, he helped other officers arrest the suspects in the Taurus. He said the defendant, Roberto Vasques, had run toward Nolensville Road but was taken into custody almost parallel to the carwash bays by Metropolitan Police Detective Mike Elrod and Metropolitan Police Sergeant Rob Forrest. He also said Metropolitan Police Detective John Donnegan had the defendant, Hector Alonzo, in custody on the passenger side of the Taurus. Detective Birchwell identified both Alonzo and Vasques in the courtroom.

Detective Birchwell testified that when the men in the cars were secured, he went to find the gray van but discovered that it had already left. He said two other guns were recovered from the scene. He said that one of the guns was recovered beside the Taurus and that the other one was recovered in a carwash bay near where Roberto Vasques had run. He said that although no one saw Vasques throw the gun in the carwash bay, no other defendant could have thrown a gun in the carwash bay because they were not close enough to it. Detective Birchwell also testified that there were three black trash bags in the trunk of the Taurus and one black trash bag on the pavement behind the Taurus containing approximately one hundred pounds of marijuana.

Detective Birchwell testified that part of the Metropolitan Police Department's booking procedure is to determine the suspect's address. He said that Roberto Vasques was born in Dallas, Texas and had a Dallas, Texas address; that David Romero was born in Mexico and refused to give an address; that Hector Alonzo had a Laredo, Texas address; that Victor Garza had a Laredo, Texas address; that Luis Martin Vasquez had a Grand Prairie, Texas address; and that Kevin Joel Hernandez had a Nashville, Tennessee address.

On cross-examination, Detective Birchwell admitted the telephone call the informant made to his supplier was audiotaped, but he said he did not have the tape with him. He also admitted the

---

[1]The record reflects that a total of seven suspects in the three cars were apprehended at the scene but that one of them, Joaquin Bonilla, was not tried jointly with the defendants.

informant wore a wire, but he said he did not have that audiotape with him either. He admitted he could not be one hundred percent certain that the defendant, David Romero, was the David the informant had called the night before. Finally, Detective Birchwell admitted that he was not the officer who arrested Jose Rodriguez or convinced him to help the investigation.

Metropolitan Police Detective Greg Adams testified that on April 19, he set up surveillance of the carwash from the Dairy Queen parking lot. He said he had been told to look for a Camry, another white car, and a black Firebird, which he had been told was running counter-surveillance. He said the Firebird pulled in directly beside him. He said the two male Hispanics in the car never exited the car but just sat there watching the carwash. He said the Firebird stayed at Dairy Queen two or three minutes before backing out and leaving. He said he was unable to identify the men in the Firebird.

On cross-examination, Detective Adams said that the men in the Firebird were curious about him. He said they were looking around and keeping their eyes on the parking lot. He admitted that he did not see the men talking on a radio and did not see any weapons.

Metropolitan Police Officer Herbert Kajihara testified that on April 19, he and TBI Agent Pat Howell set up surveillance of the carwash. He said he saw the Firebird drive slowly through the Dairy Queen parking lot. He said the occupants of the car were "slouched" down in the seat and looking back and forth for either a parking space or people. He said that the car parked facing the carwash but that no one exited the car. He admitted that he did not see a passenger in the Firebird until the arrests.

On cross-examination, Officer Kajihara admitted that he did not see the Firebird park at Dairy Queen or the presence of Detective Adams in the Dairy Queen parking lot. He said he did not see Detective Adams because his view was blocked by a building. Officer Kajihara said that after the Firebird left the Dairy Queen Parking lot, it parked in the Burger King parking lot. He admitted he quit watching the carwash after the Firebird parked behind him at Burger King. He said that when the "take down" signal was given, he approached the Firebird, which Metropolitan Police Detective Leon Taylor had blocked in the parking space with his car. He said the suspects in the Firebird did not attempt to flee.

Detective Taylor testified that on April 19, he established surveillance on one of the houses located at Antioch Pike and later at the carwash. He said that he followed the Camry from the carwash to the Walgreens located at the corner of Antioch Pike and Nolensville Road. He said the Camry was met in the Walgreens parking lot by a white Ford Taurus. He said that after a short time, the Taurus left and proceeded down Antioch Pike toward the two houses identified by the informant. He said that he remained at Walgreens to keep surveillance on the Camry. He said that when the Taurus returned ten minutes later, it was followed by a black Firebird. He said that as the Taurus and Firebird approached Walgreens, the Camry appeared ready to leave, but he admitted that he could not see if either the Taurus or Firebird entered the Walgreens parking lot.

Detective Taylor said he followed the cars from Walgreens back to the carwash where he established surveillance from Burger King. He said he was told that the Firebird was also in the Burger King parking lot. He said that when the signal was given, he pulled his car behind the Firebird to make the arrests. He said that he was able to pull in behind the Firebird and that he was not noticed until he got to the driver's door because the passengers were not paying attention to what was going on behind them. Detective Taylor identified the defendant, Victor Hugo Garza, as the driver of the Firebird and the defendant, Luis Martin Vasquez, as the passenger. He said that he arrested Garza and that Officer Kajihara arrested Vasquez. He said that after the defendants were in custody, he searched the car and found a shotgun loaded with five shells behind the front seat. He said there were no Burger King sandwiches or other evidence that the defendants had been in Burger King.

On cross-examination, Detective Taylor admitted that he could not tell conclusively what the defendants were actually doing while parked at the Walgreens. He said other officers informed him that after the Taurus left Walgreens, it went to one of the houses on Antioch Pike. He also admitted that he did not see the Firebird drive through the Dairy Queen parking lot. Finally, he admitted the Firebird contained no evidence of drug trafficking.

Sergeant Forrest testified that on April 19, he assisted in surveillance on the carwash located at 3004 Nolensville Road. He said that when the "take down" signal was given, he pulled in to block the cars and saw several men running. He said that he tackled Roberto Vasques near the first carwash bay. He said that a citizen at the carwash pointed out a handgun on the ground in the back of the first carwash bay.

On cross-examination, Sergeant Forrest said that he was certain that he tackled Vasques next to the first carwash bay. However, he admitted that because his view was blocked, he could not tell if Vasques threw a gun into the bay. He also admitted that he only saw Vasques for a few seconds before tackling him. He said he saw the cars earlier and the suspects standing outside on the road. He said that when he pulled in, he lost sight of Vasques until Vasques ran around the corner. He estimated that it would have taken Vasques one or two seconds to run the width of the first carwash bay.

Detective John Donnegan testified that on April 19, he participated in the surveillance of the carwash and arrest of the suspects. He said that he saw the white Camry with two Hispanic men pull into the carwash beside the informant. He said that he also saw a gray van with three Hispanics in it and that one of them appeared to be talking on a walkie-talkie. He said that he monitored the informant's transmitter and could tell he was talking with someone.

Detective Donnegan testified that when the Camry returned twenty to thirty minutes later, it was followed by a white Taurus and a black Firebird. He said the Camry and the Taurus turned into the carwash, but he could not see where the Firebird went. He said that there were three suspects standing by the Taurus as he pulled into the carwash. He said he arrested Hector Alonzo, whom he identified in court, on the passenger side of the Taurus. He said that a gun was recovered

beside the Taurus. He said that while he was at the scene, he saw the Firebird again in the Burger King parking lot.

Detective Donnegan testified that after the carwash was secured, the police searched the houses located at 1035 and 1147 Antioch Pike. He said that they recovered a safe containing money, electronic scales, marijuana, ammunition, a loaded pistol magazine, and a box to a Glock model 26 pistol from 1035 Antioch Pike. He said they recovered a Glock 26 Pistol and ten trash bags each containing twenty-five one-pound bags of marijuana from 1147 Antioch Pike. He said that the bags of marijuana found at the house were identical to the bags found in the Taurus. He said that they found a drug ledger containing records of amounts paid and stating that the drugs were being shipped in a tractor trailer. He said that in the bedroom of the house, they found eight one-pound bags of marijuana and a shotgun. He said he filled out the paper work to send the marijuana recovered from the houses to the crime lab. He identified the drugs admitted into evidence as the drugs seized at the houses.

On cross-examination, Detective Donnegan admitted that he did not see the passenger in the Camry using a walkie-talkie. He also admitted that other than a pistol, the Camry contained no other evidence.

Metropolitan Police Officer Thomas Rollins testified that he set up surveillance in the Antioch Pike area on April 19. He said a white Ford Taurus, occupied by three male Hispanics, pulled into the driveway at 1147 Antioch Pike. He said the driver knocked on the door and stood there for a few minutes before returning to the Taurus and driving to 1035 Antioch Pike. He said the residence on 1035 Antioch Pike was a duplex. He said he followed the Taurus from 1147 to 1035 Antioch Pike where the Taurus pulled around behind the right hand side of the duplex and parked. He said he did not see anyone get out of the car. He said that shortly thereafter, two male Hispanics pulled into the driveway in a black Firebird and parked in the front on the left hand side of the duplex. He said the men got out of the car and walked toward the back of the duplex. Officer Rollins said that when he drove back by the house, the trunk of the Firebird was open. He said that the Taurus left the duplex first followed by the Firebird and that both cars went to Walgreens where they met the white Camry. He said that a few minutes later, the Firebird, the Taurus, and the Camry left Walgreens together and drove toward the carwash.

Officer Rollins testified that after the carwash was secured, he assisted in securing the houses at 1035 and 1147 Antioch Pike until search warrants could be obtained. He said that at 1147 Antioch Pike, they recovered a revolver, two loaded semi-automatic pistols (including the Glock 26), a semi-automatic rifle magazine, ammunition, scales, and a large amount of marijuana. He said that he seized the drugs at 1147 Antioch Pike and turned them into the Metropolitan Police Department's property room. He also identified the drugs admitted into evidence as the drugs seized at the house.

On cross-examination, Officer Rollins admitted that he did not see the defendants talking to each other while parked at the Walgreens, but he believed it was obvious that they knew each other. He admitted that he never saw the Camry at either house on Antioch Pike.

Metropolitan Police Detective Mike Clark testified that on April 19, he provided surveillance at the carwash located on Nolensville Road. He said that he saw the white Camry leave the carwash and that he followed it to Walgreens where a white Taurus parked beside the Camry. He said he followed the Taurus on Antioch Pike for a short time before he turned onto another road. He said that upon being told that the Taurus had left 1147 Antioch Pike and pulled into 1035 Antioch Pike, he drove by 1035 Antioch Pike and saw a black Firebird. He said he saw the Taurus drive back toward Walgreens, followed by the Firebird.

Detective Clark testified that as the cars traveled back toward Walgreens, they passed Glencliff Elementary School, Glencliff High School, and Wright Middle School. He said that before trial, he measured the distances from the schools to the road. He said that the measurement from Glencliff Elementary School to Antioch Pike was 200 feet and that the measurement from Glencliff High School to Antioch Pike was 202 feet. He said that the distance from the corner of Wright Middle School to Antioch Pike was 222.6 feet. He also said that Walgreens was only eighty-one feet from Radnor Baptist Academy.

Detective Clark testified that when he arrived at the carwash, he saw the trunk of the Taurus open, several suspects being handcuffed, and handguns lying around. He said he saw four large trash bags and five boxes of plastic bags in the trunk of the Taurus. He said he filled out an examination form for the TBI lab and locked the evidence in his car until he took it to the Metropolitan Police Department's evidence room. He said the complaint number on the examination form matched the drugs admitted as evidence.

On cross-examination, Detective Clark admitted that he did not measure the distances from the schools to the carwash and that the Taurus only drove past the schools. He admitted that he could only speculate as to whether a conspiracy took place while the Taurus drove past the schools. He also said, "I think it's just barely shy of a thousand feet to Radnor Baptist [from the car wash]" but admitted that he did not measure that distance. He also admitted that he could not see what took place at Walgreens and that he could not identify the occupants of the Firebird.

TBI Agent Patrick Howell testified that on April 19, he set up surveillance near the carwash on Nolensville Road. He said that from his position, he could see the back of the Dairy Queen parking lot and part of the Burger King parking lot. He said he saw the Firebird enter the Dairy Queen parking lot and pull into a parking space. He said the occupants of the Firebird glanced toward the carwash, left the Dairy Queen, and pulled into a parking spot at Burger King, facing the carwash. He said that the two men in the Firebird were constantly looking straight ahead, that he was between the Firebird and the carwash, and that he was afraid the suspects would identify him as a police officer. He said the Firebird did not go through the drive-thru at either Burger King or Dairy Queen and neither suspect left the car at Burger King or Dairy Queen. On cross-examination, Agent Howell admitted that he did not participate in the arrest of either suspect in the Firebird because Officer Kajihara and Officer Taylor had the situation under control.

Metropolitan Police employee Mary Wilhoite testified concerning the safe keeping of the evidence until trial. She said that an officer is called in to check in the evidence and place it in a drug vault and that very few people have access to the vault. She said the drugs recovered from the carwash were received at 9:25 p.m. on April 19 and stored in the drug vault. She said the drugs were sent to the lab on August 17, 2000. She said all evidence that comes into the property room is sealed and initialed, making it impossible to tamper with the evidence. She said the evidence from the houses on Antioch Pike was also received on April 19 and later sent to the lab for testing. She said that before the drugs are sent to the lab, they are put in boxes, sealed, and initialed. She said the lab will not take unsealed evidence.

TBI forensic chemist Donna Flowers testified that evidence is received in a sealed condition either through hand delivery or certified U.S. mail. She said that if evidence is received unsealed, it may still be tested but that it is noted in the record. She said the evidence from the Taurus was received in a sealed condition. She said she resealed the evidence after it was analyzed. She said that the laboratory number on the evidence matched the number she put on the evidence after her analysis. She said she examined the boxes and found that they contained a total of 93.8 pounds of marijuana. She also testified that the evidence from 1035 Antioch Pike was received in a sealed condition and was not tampered with. She said she examined the evidence and found it to be 250.5 pounds of marijuana

TBI forensic scientist William H. Stanton, Jr. testified that he received the evidence taken from 1147 Antioch Pike in a sealed condition and that it would not have been accepted if it were not sealed. He said he found the substance to be 21.2 pounds of marijuana. Based upon this evidence, the jury convicted each defendant of conspiracy to possess with the intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone.

THE CORAM NOBIS HEARING

After the conclusion of the motion for new trial hearing, the state informed the defendants that TBI Agent Patrick Howell had been using cocaine, which he stole from the TBI crime lab, during the time of the investigation and trial of the defendants. At the coram nobis hearing, former Agent Howell testified that he began using cocaine during a six week period in late 1997 or early 1998. He admitted he took a leave from the TBI in February 1998 and returned a year and a half later. He also admitted using cocaine again as early as July 2000. He admitted that by 2001, he was using cocaine twice a week, sometimes with prostitutes, whom he paid with cocaine. He said he had not used marijuana since high school.

Howell testified that he would get cocaine by removing small amounts before he turned in evidence purchased in undercover buys. He explained that he usually took a gram or one-half gram at these times. He said he knew he would not get caught because it was not unusual for there to be discrepancies in weight. He also admitted to taking cocaine from evidence he had checked out of the TBI lab for reverse buy operations. He said that to hide the change in weight, he would use duct tape when he repackaged the drugs or add baking soda.

Howell said that he self-reported his actions to his supervisor, TBI Agent Roy Copeland, on September 15, 2001. He also said he told Detective Mike Clark on the same day. Howell admitted that during this time, he may have experienced drug-related paranoia and believed that he was being followed by authorities.

Howell said he was indicted on five charges. He admitted that he pled guilty to two counts of tampering with evidence and that the state dropped the other charges. He said that he was sentenced to three years to be served on community corrections and that he was required to attend a drug court program.

Howell testified that he was the lead TBI agent in the investigation of the defendants, but he also asserted that because it was a joint investigation, Metropolitan Vice had its own lead officer. He said he was involved in the arrest of Jose Rodriguez which led to the investigation of the defendants. He recalled Rodriguez making a telephone call to assist the TBI and Metropolitan police in catching his supplier. He said he was sure that he monitored the telephone call but was not sure if anyone else monitored it with him. Howell admitted he testified at the defendants' preliminary hearing and in front of the grand jury, but he said that he did not testify in front of the grand jury which returned a superseding indictment or take the lead role in the trial testimony.

Howell asserted that he did not use cocaine while working. He said that although the defendants' arrests and trial were during the time he was using cocaine, he did not use cocaine during the investigation or trial of the defendants. He also admitted to stealing cocaine from evidence on April 6, 2001, the day after the defendants' trial. Howell said he received high evaluations but admitted that he had received lower evaluations for not turning in documentation in a timely manner. He said this was not a result of his cocaine addiction.

Howell said that his bank records were used by the TBI to investigate his illegal activity. His bank records showed the purchase of a movie in a hotel room on January 8, 2001; a purchase from an adult video store on March 5, 2001; and a call to Friend Finder on April 5, 2001. He admitted that whenever he used prostitutes, he was likely using cocaine. Howell's bank records also indicated that he had eleven accounts and that some of these accounts contained more than $100,000 and others contained over $20,000. Howell did not recall any of the bank accounts being his and said he never had a bank account with $100,000. He said that maybe the accounts were those he used for TBI purposes. Howell said that he paid prostitutes in cash but acknowledged that his bank records did not reflect any ATM withdrawals and that his paycheck was directly deposited. Howell said he was unaware of any discrepancy between the amounts of money he took for TBI purposes and the amount that the Metropolitan police took for the same purposes.

Officer Birchwell testified that Agent Howell's arrest of Jose Rodriguez led to the investigation of the defendants. He said that he did not remember being present when Rodriguez called his supplier. However, he said it was possible he was there because Agent Howell worked closely with Metropolitan Vice. He could not recall whether he participated in setting up the buy investigation that led to the defendants' arrests. Officer Birchwell admitted that he would not want

to work with an officer who had a cocaine problem because such an officer would not think properly and would not be trustworthy.

Detective Clark testified that Agent Howell told him about his illegal activities on the same day he told his TBI supervisor. He said Agent Howell wanted to apologize for some activities involving prostitutes. He said that Agent Howell thought that Metropolitan Vice was following him. He said that at that point, either Agent Howell's supervisor from the TBI came over or called in and Agent Howell said he had to go. He said he learned Agent Howell had been using cocaine and tampering with evidence a couple of days later. He said that he did not turn Agent Howell in because Agent Howell told him that he had already informed his supervisor at the TBI of his illegal activities. He said he was not aware of any illegal activity by Agent Howell during the trial. He said that, to his knowledge, no police officer knew about Agent Howell's criminal behavior at the time of the trial.

On cross-examination, Detective Clark admitted that he took no action to report Agent Howell because he believed Agent Howell had already told his supervisor. He admitted that he should have reported Agent Howell's confession. He admitted that he may have told a few people at work about Agent Howell's confession. He said that in the several investigations he worked with him, Agent Howell's behavior was normal. Based upon this newly discovered evidence, the trial court granted each defendant's writ of error coram nobis and ordered a new trial for the defendants.

## I. CORAM NOBIS RELIEF

The state contends the trial court erred in granting the defendants coram nobis relief. It claims that there was sufficient evidence to convict each defendant of conspiracy even in the absence of Agent Howell's testimony. The defendants contend the trial court properly granted coram nobis relief based upon Agent Howell's illegal actions. We conclude the trial court's order vacating the defendants' convictions should be affirmed as to Luis Vasquez and Victor Garza but reversed as to the other defendants.

A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." T.C.A. § 40-26-105; State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). The decision to grant or deny such a writ rests within the sound discretion of the trial court. Teague v. State, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988), cert. denied 493 U.S. 874, 110 S. Ct. 210 (1989). In exercising its discretion, the trial court must determine the credibility of the witnesses who testify in support of the petition for writ of error coram nobis. Hart, 911 S.W.2d at 375.

In granting the defendants' petitions for coram nobis relief, the trial court stated,

> The Court is, therefore, of the opinion that the criminal acts and drug
> addiction of former Agent Howell constitute newly discovered

-10-

evidence, within the meaning of the statute, and that the Petitioners were without fault in failing to use or present the evidence at trial.

Having made these findings, the Court is presented with the issue of what standard to apply. The Petitioners argue that the appropriate standard to be applied is whether the new evidence, if presented to the jury, may have resulted in a different outcome. . . . The State, however, argues that the standard to be applied in this case is whether the new evidence in this case is likely to have changed the outcome of the trial, not whether the outcome may have been different. . . .

After considering the arguments and authority cited by all of the parties, the Court is persuaded by the Petitioners' argument. The Court points out that the plain text of the coram nobis statute clearly indicates that a writ will lie for newly discovered evidence if the judge determines that the evidence "may" have resulted in a different judgment. . . . Based on this unambiguous language, the Court is of the opinion that the standard to be applied is whether the new evidence, if presented to the jury, may have resulted in a different outcome, and that under the facts and circumstances of this case, the Petitioners' contention is well taken.

The Court is of the opinion that former Agent Howell's role in the investigation and prosecution of this case was vital in obtaining convictions against the Petitioners. The Court is also of the opinion that, had the information regarding his criminal acts and drug addiction been available to the Petitioners, he could have been cross-examined regarding his drug use and criminal acts, his credibility could have been attacked, and alternate defenses might have been employed by the Petitioners. The Court is of the opinion that a reasonable jury, informed of former Agent Howell's drug use and criminal acts, may have chosen to reject all or part of his testimony. This information may have also caused the jury to question the integrity of the entire investigation in spite of the diligent and professional efforts of members of the Nashville Police Department Vice Squad in the investigation and apprehension of the Petitioners in this case.

The Court acknowledges that former Agent Howell's testimony was particularly detrimental to Petitioners Luis Vasquez and Victor Garza, as he was the witness who identified them at the crime scene. The Court, however, does not find that former Agent

-11-

Howell's effect on the outcome of this case is limited to Petitioners Luis Vasquez and Victor Garza. The Court points out that former Agent Howell played a leading role in acquiring evidence that was used against all of the Petitioners. The Court is of the opinion that his testimony was also used by the State against all of the Petitioners and was considered by the jury. . . .

Accordingly, it is hereby ORDERED that the Petition for Writ of Error Coram Nobis be granted and this case be placed on the Court's docket for a new trial or further proceedings.

Initially, we note that the trial court relied on the plain language of the statute in determining that the proper standard for reviewing the merits of the defendants' petitions for writ of error coram nobis was whether the new evidence may have resulted in a different judgment. However, notwithstanding the plain language of the statute, this court has previously held that the "'reasonable probability' standard is the proper interpretation of the 'may have resulted in a different judgment' language used in Tennessee Code Annotated section 40-26-105." State v. Workman, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002).

In Workman, this court equated the "reasonable probability" standard to that used in cases where the state fails to turn over materially exculpatory evidence to the defense, United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375 (1985); State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995), and in cases involving the ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052 (1984); Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). In the context of ineffective assistance of counsel, the Supreme Court has defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome" of the proceedings. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; see also Bagley, 473 U.S. at 682, 105 S. Ct. at 3383 (stating the definition of "reasonable probability" is "a probability sufficient to undermine confidence in the outcome").

We further note that in Workman, this court analyzed the coram nobis statute and stated,

It is arguable that the "may have resulted in a different judgment" language should be viewed under the same standard as a motion for new trial based upon newly discovered evidence. The test in such a situation is whether the newly discovered evidence "will likely change the result of the trial." State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994). However, this appears on its face to be a higher standard than the "may have" language in the statute and the "might have" language used by our supreme court in [State v. ]Mixon[, 983 S.W.2d 661 (Tenn. 1999)]. Furthermore, a lesser standard would appear to be more appropriate . . . .

111 S.W.3d at 18. This court concluded that the "reasonable probability" standard constituted a lesser standard than the "will likely change the result of the trial" language for a motion for new trial hearing. We conclude that this result is incongruous. We discern little effective difference between "a probability sufficient to undermine confidence in the outcome" and "will likely change the result of the trial." We further note that the history of the coram nobis statute, our supreme court's pronouncements in this arena, and the definition of the word "may" buttress the contention that both of the foregoing standards are incompatible with the statute's plain meaning.

The history of coram nobis relief indicates that, previously, newly discovered evidence would serve as a proper basis for relief only if the evidence would have changed the outcome of the proceedings. See Dinsmore v. Boyd, 74 Tenn. 689 (1881); Mahalovitch v. Vaughn, 60 Tenn. 325 (1872); accord State ex rel. Carlson v. State, 407 S.W.2d 165 (Tenn. 1966); see generally 18 Am. Jur. 2d Coram Nobis § 18 (1985). When our General Assembly first provided for coram nobis relief in criminal proceedings, it mandated that such proceedings "be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except in so far as inconsistent herewith." 1955 Tenn. Pub. Acts ch. 166, § 1.

In 1978, the General Assembly amended the coram nobis statute for criminal proceedings by adding the following sentence:

> Upon a showing by the defendant that he was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at trial.

1978 Tenn. Pub. Acts ch. 738, § 1. We note that the legislature is presumed to know the state of the law at the time the legislation is passed. See Wilson v. Johnson County, 879 S.W.2d 807, 810 (Tenn. 1994). Therefore, we conclude that our General Assembly's amendment to the coram nobis statute was designed in part to alter the standard for determining when newly discovered evidence would warrant relief.

In Cole v. State, 589 S.W.2d 941, 943 (Tenn. Crim. App. 1979), this court in reviewing a coram nobis petition brought under the amended statute stated that in order to grant coram nobis relief,

> the trial judge must make the following findings:
> (1) whether or not there now exists subsequently or newly discovered evidence (even though related to matters previously litigated),
> (2) which might have resulted in a different judgment had it been presented at trial,

-13-

(3) but which was not presented at that time through no fault of the defendant.

(Emphasis added).  We note this is the same language used by our supreme court in Mixon.

In Mixon, after the trial and during the pendency of the appeal, the defendant's daughter recanted her testimony that her father attempted to rape her, stating that her mother told her to tell authorities her father attempted to rape her because her mother was planning to divorce her father. 983 S.W.2d at 664-65.  While the court did not decide the case on the coram nobis issue, it did agree that this court had previously "enunciated the correct standard which should be applied by trial courts in determining whether a new trial should be granted upon the basis of newly discovered [evidence]."  Id. at 673.  That standard is whether

(1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

Id. at 673 n.17 (emphasis added).  In Workman v. State, 41 S.W.3d 100 (Tenn. 2001), the court addressed the summary dismissal of the petitioner's petition for coram nobis relief.  In reversing the summary dismissal, the supreme court again cited the standard it enunciated in Mixon as the appropriate standard for adjudicating a petition for writ of error coram nobis.

Concerning the statutory language, Webster defines the word "may" as (1) "have the ability to" or (2) "used to indicate possibility."  Merriam Webster's College Dictionary 718-19 (10th ed. 1996).  Black's Law Dictionary defines "may" as "[a]n auxiliary verb qualifying the meaning of another verb by expressing . . . possibility, probability or contingency. . . ."  Black's Law Dictionary 676 (6th ed. 1991).

We believe that the "reasonable probability" standard defined as "a probability sufficient to undermine confidence in the outcome" is incompatible with the statute's plain meaning.  We also believe that in determining whether to grant coram nobis relief based upon newly discovered evidence, the proper standard should be whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different.

However, we note that the proper standard for determining whether to grant a writ of error coram nobis was not an issue before the supreme court in Workman or Mixon or this court in Cole but was an issue before this court on remand in Workman.  Therefore, we are obligated to follow Workman as controlling authority for the "reasonable probability" standard.  See Tenn. Sup. Ct. R. 4(H)(2). We note that upon further review, this case could provide our supreme court an opportunity

to clarify this area of the law and determine the proper standard for interpreting the "may have changed the result" language in T.C.A. § 40-26-105.

Turning to the facts of this case, we note that at the trial, Agent Howell did not testify that he was personally involved in apprehending or identifying Roberto Vasques, Luis David Romero, Kevin Hernandez, or Hector Alonzo. However, myriad officers of the Metropolitan Police Department did testify that Roberto Vasques, Luis David Romero, Kevin Hernandez, and Hector Alonzo were the same persons they apprehended at the car wash.

Notwithstanding, the defendants contend that their defense strategies would have changed had they known about Agent Howell's illicit drug use, and the trial court noted that Agent Howell's illegal activities may have caused the jury to question the validity or integrity of the entire investigation. If the standard for granting a writ or error coram nobis were the statutory "may have changed the result" language, we would conclude that the trial court did not abuse its discretion in granting the writs of error coram nobis to Roberto Vasques, Luis David Romero, Kevin Hernandez, and Hector Alonzo. However, we cannot conclude that the stain placed on the integrity of the entire investigation by Agent Howell's illegal actions constitutes a "reasonable probability" that the jury's verdict would have changed "sufficient to undermine [our] confidence in the outcome." We therefore conclude that the trial court abused its discretion in granting Roberto Vasques, Luis David Romero, Kevin Hernandez, and Hector Alonzo coram nobis relief.

As the trial court noted, Agent Howell directly implicated defendants Luis Vasquez and Victor Garza in the conspiracy. We do note, however, that Detective Adams observed Vasquez and Garza in the Firebird when they parked next to him at the Dairy Queen, but his testimony reflects that Vasquez and Garza were only parked next to him for one to two minutes before leaving the Dairy Queen. We also note that Officer Rollins saw the Firebird at the duplex at the same time the Taurus was there and that a loaded shotgun was found in the Firebird. On the other hand, Agent Howell testified that when Vasquez and Garza pulled into the Burger King parking lot, he observed them constantly looking straight ahead in the direction of the car wash. He also said that neither Luis Vasquez nor Victor Garza went into the Burger King or exited the car. We conclude this testimony was especially damaging in light of the fact that Vasquez and Garza were not apprehended at the scene and were not in either actual or constructive possession of the marijuana. As to the Firebird's presence at 1035 Antioch Pike, we note that Officer Rollins testimony placed the Firebird on one side of the building and the Taurus on the other side, behind the building. However, he did not testify as to any meetings or communications between Vasquez and Garza and the occupants of the Taurus. Therefore, we conclude that based upon the newly discovered evidence, a "reasonable probability" exists "sufficient to undermine [our] confidence in the outcome" that the jury's verdict would have changed and the trial court did not abuse its discretion in granting the writs of error coram nobis to these defendants.

Mixon instructs us that procedurally, we are to address the coram nobis issue first when it has been granted by the trial court because, should this court affirm, the defendant's issues on direct appeal become moot. 983 S.W.2d at 672. However, in this case, if the evidence is insufficient to

-15-

sustain the convictions of Luis Vasquez and Victor Garza, a conviction on remand could offend the Double Jeopardy provision of the federal constitution. Therefore, even though we have affirmed the trial court's grant of coram nobis relief, we will address the sufficiency arguments of Mr. Vasquez and Mr. Garza.

## II. SUFFICIENCY OF THE EVIDENCE

All defendants contend that the evidence at trial was insufficient to support their convictions. As particularly discussed below in detail as to each defendant, all or some of them claim (1) the state failed to prove that the defendants entered into an agreement to sell marijuana in a school zone; (2) the state failed to prove that some of them were within 1000 feet of a school zone while in possession of the marijuana or that the car wash was within 1000 feet of a school zone; (3) the state failed to prove that some of them entered into an agreement to possess or sell drugs; (4) the state failed to prove that some of them committed overt acts in furtherance of the conspiracy; (5) the state failed to prove that one of them was in any of the three cars; and (6) the state's case as to some of the defendants was based entirely on circumstantial evidence, and as such, it failed to exclude every other reasonable hypothesis save the guilt of those defendants. The state contends the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

In order to prove the conspiracy, the state was required to prove that

> two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.
>
> . . . .
>
> No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired.

-16-

T.C.A. § 39-12-103(a), (d).

In order to prove the underlying offense, the state was required to prove the defendants knowingly possessed "a controlled substance with intent to manufacture, deliver or sell such controlled substance." T.C.A. § 39-17-417(a)(4). Tennessee Code Annotated section 39-17-432(b) provides that

> A violation of § 39-17-417, or a conspiracy to violate such section, that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school or secondary school shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(I) for such violation.

We begin by noting that the essence of conspiracy has always been an agreement to commit a crime. State v. Hodgkinson, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989); accord Owens v. State, 84 Tenn. 1, 3 (1885). Obviously, a conspiracy requires a knowing involvement. However, no formal or expressed agreement is necessary and the agreement may be proved by circumstantial evidence. State v. Shropshire, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). To prove a conspiracy, it is not necessary that the state show a formal agreement between the parties to do the unlawful act, but a mutually implied understanding is sufficient, although not manifested by any formal words, or by a written agreement. Id. The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in every detail of execution. Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

## A. Defendant Roberto Vasques

Defendant Vasques contends the evidence is insufficient because at trial, the state's proof failed to place him inside any of the three cars involved. He claims the only evidence presented by the state "was that the arresting officer saw [the defendant] running for his life at the car wash." He asserts that he was simply "loitering at the car wash" and ran when the police arrived, "waiving their guns." The state contends the evidence is sufficient.

In the light most favorable to the state, the evidence shows that the informant called his contact, the defendant Romero, who agreed to sell the informant marijuana and deliver it to the car wash, that Romero arrived at the Walgreens in the Camry followed by the Taurus and the Firebird, that the three cars parked next to each other, that the Camry and Taurus proceeded to the car wash to deliver the marijuana, and that the Firebird staked out a location at the Burger King parking lot with a direct view of the car wash. When the arrest order was given, Sergeant Forrest tackled Vasques, who was "running for his life" near one of the car wash bays. A subsequent search of the area revealed the presence of over seventy pounds of marijuana in the trunk of the Taurus and the presence of a gun inside the car wash bay adjacent to where the defendant was apprehended. We

-17-

also note that the evidence shows that the three cars contained seven suspects and that seven suspects were apprehended at the two locations. We conclude the evidence, though circumstantial, is sufficient for a rational trier of fact to find that Vasques conspired together with the other defendants to possess with the intent to sell over seventy pounds of marijuana within one thousand feet of a school zone. Vasques is not entitled to relief on this issue.

### B. Defendant Luis D. Vidales Romero

Defendant Romero contends the evidence is insufficient because the state failed to prove that any part of the conspiracy occurred within one thousand feet of a school zone. He claims that the state failed to prove the car he was in, the Camry, ever drove past the schools on Nolensville Road and that no overt act occurred at the Walgreens, which he concedes was within one thousand feet of Radnor Baptist Elementary School. He also contends the state failed to prove that he knowingly entered into a conspiracy to possess marijuana with the intent to sell it. He claims the evidence was "wholly insufficient to prove a conspiracy [simply] because to [sic] vehicles pulled up in the same parking lot." The state contends the evidence is sufficient.

In the light most favorable to the state, the evidence shows that the informant called his supplier, David, and arranged to make a large purchase of marijuana. At a time arranged during the conversation, a white Camry arrived at the car wash on Nolensville Road and the occupants spoke with the informant and told him they were going to get the marijuana. The Camry then went to Walgreens where it was met by the Taurus. The Taurus left and went to the house on Antioch Pike, where it was met by a Firebird. Approximately twenty minutes later, the Taurus and the Firebird traveled together to Walgreens and parked next to the Camry. All three cars then went to the car wash. While the Firebird parked at the Burger King in a position that allowed the occupants an unimpeded view of the car wash, the Taurus and the Camry pulled into the car wash. When the police moved in to arrest Romero, who was in the Camry, he fled but was captured. A search of the Taurus revealed over seventy pounds of marijuana, a search of the defendant revealed a handgun, and a search of the Camry revealed communication equipment. We conclude the evidence is sufficient for a rational trier of fact to find that Romero conspired together with the others to possess with the intent to sell over seventy pounds of marijuana.

Concerning the enhancement statute, the evidence shows that the Taurus containing the marijuana met with the Camry and the Firebird at Walgreens, eighty-one feet from Radnor Baptist Elementary School. We conclude this meeting was an act in furtherance of the conspiracy which attaches criminal liability to all of the defendants through the conspiracy statute. See T.C.A. § 39-12-103. We also conclude that this act occurred within one thousand feet of a school zone, Radnor Baptist Elementary School, thereby triggering the enhancement provisions of the Drug-Free School Zone Act. See T.C.A. § 39-17-432. In any event, we note that on cross-examination, Detective Clark said without objection that he thought Radnor Baptist Elemetary School was "just shy" of one thousand feet from the car wash. Therefore, his statement that the car wash was within one thousand feet of the school zone was before the jury, and Romero and his confederates were apprehended at

the car wash while attempting to deliver the marijuana, certainly an overt act in furtherance of their agreement. Romero is not entitled to relief on this issue.

## C. Defendant Kevin Joel Hernandez

Defendant Hernandez contends the evidence is insufficient because the state failed to prove he entered into an agreement to sell or deliver marijuana. He claims that the state's proof constituted only circumstantial evidence based upon his presence in the Camry, which does not establish his entering into a conspiracy to sell drugs. He also contends the evidence presented at trial failed to establish that any part of the conspiracy occurred within one thousand feet of a school zone. He claims that Tennessee's Drug-Free School Zone Act requires a person to have the intent to sell within one thousand feet of a school zone, that the state failed to prove an intent to sell at any location other than the car wash, and that the state failed to prove the car wash was within one thousand feet of a school zone. Finally, Hernandez claims that application of the Drug-Free School Zone Act in this case, resulting in his having to serve a minimum of fifteen years in the Department of Correction before achieving parole eligibility, "is surely not the type situation contemplated by the school zone statute," because once a conspiracy exists, it "will continue for days, weeks, months or longer until the desired result is achieved or the participants withdraw." The state contends the evidence is sufficient.

In the light most favorable to the state, the evidence shows that the defendant Kevin Joel Hernandez was arrested at the car wash while sitting in the passenger seat of the Camry. It also shows the Camry, Taurus, and Firebird met at Walgreens and proceeded to the car wash in order to sell the drugs. At the car wash, a search revealed the presence of over seventy pounds of marijuana in the trunk of the Taurus and communication equipment in the Camry. We conclude that the evidence, though circumstantial, was sufficient for a rational trier of fact to find that Hernandez entered into an agreement with his confederates to sell marijuana at the car wash and that the defendants committed overt acts in furtherance of their conspiracy by meeting at Walgreens with the drugs and by proceeding to the car wash with the drugs in order to sell them. Concerning Hernandez' contention that no part of the conspiracy occurred within one thousand feet of the school zone, we conclude his argument is controlled by our analysis of the argument presented by the defendant Luis David Romero.

Hernandez' final argument is presented in his brief under the section titled "Summary." While it is a litany of complaints concerning the operation of the Drug-Free School Zone Act in this case, it is devoid of any legal justification for suspending the application of the Act to the defendant. He does not assert that the Act is overbroad or vague or that its application violated his right to due process of law. He does, however, cite State v. Fields, 40 S.W.3d 435 (Tenn. 2001), for the proposition that our supreme court's "language and reasoning . . . is persuasive on this issue. It is clear they are uncomfortable with the strict liability nature of the school zone statute and are reluctant to apply its enhancement on a per se basis." He further contends that this court "should also be uneasy with the sentence in this case being enhanced based on the mere passing through the school zone incident to the intended activity."

-19-

The defendant's reliance on Fields is misplaced. In Fields, the defendant and his accomplice sold cocaine to an undercover informant, and the jury convicted the defendant of facilitation of the sale of cocaine, a Class C felony. At the sentencing hearing regarding the manner of service of the sentence, the state showed that the drug transaction occurred within one thousand feet of a school zone, thereby supporting its argument that incarceration was warranted to avoid depreciating the seriousness of the offense. The trial court ordered the defendant to serve his sentence in the Department of Correction. Fields, 40 S.W.3d at 437-38. On appeal, our supreme court held that "the mere existence of the Drug-Free School Zone Act, without more, cannot elevate the nature of this offense to one requiring incarceration." Id. at 440-41. It noted the state had failed to indict the defendant under the Act. In this context, the court merely determined that a drug transaction occurring within one thousand feet of a school zone, standing alone, is insufficient to overcome the presumption of alternative sentencing and justify incarceration in order to avoid depreciating the seriousness of the offense. We do not believe the supreme court in Fields expressed unease about the application of the Drug-Free School Zone Act through strict liability.

Concerning the contention that this court should be uneasy about the enhanced penalties for merely passing through a school zone, we note Hernandez' brief does not cite any authority to support his contention. In any event, we conclude that the defendant could have easily avoided the enhanced penalties under the Act by not conspiring to sell drugs within one thousand feet of a school zone. He and his confederates could have chosen a location to sell the drugs which was not within one thousand feet of a school zone and could have chosen not to commit overt acts in furtherance of their agreement within one thousand feet of a school zone. Hernandez is not entitled to relief on this issue.

## D. Defendant Luis Martin Vasquez

Defendant Vasquez contends the evidence is insufficient because the state (1) failed to prove he entered into an agreement to sell drugs, (2) failed to prove any overt act of the defendant in furtherance of the conspiracy, and (3) failed to prove the conspiracy occurred within one thousand feet of a school zone. He claims that the proof only established his presence at the crime scene, which he claims is insufficient evidence to convict on conspiracy charges and that the state failed to prove any of the overt acts alleged against him in the indictment. He concedes that the state proved he was in a car at the Walgreens parked next to the Taurus and the Camry, but he maintains this did not constitute an overt act in furtherance of the conspiracy. He further claims that the state failed to prove that any of the defendants knew they were within one thousand feet of a school zone and that the legislature did not intend for enhanced penalties to attach under the Drug-Free School Zone Act for simply driving with drugs past a school. The state contends the evidence is sufficient.

In the light most favorable to the state, the evidence reflects that Vasquez was in the Firebird, that the Firebird was observed at one of the houses on Antioch Pike, that it followed the Taurus to the Walgreens where it met with the Taurus and the Camry, that it followed the Taurus and the Camry to the car wash, but that it stopped short of the car wash, turned into the Burger King, and set up surveillance of the car wash. After the arrest order was given, resulting searches revealed the

presence of a weapon in the Firebird, over seventy pounds of marijuana in the trunk of the Taurus, communication equipment in the Camry, and other weapons. We conclude the evidence is sufficient for a rational trier of fact to find that Vasquez conspired together with the others to possess with the intent to sell over seventy pounds of marijuana.

Concerning the defendant's arguments relative to the enhanced penalties of the Drug-Free School Zone Act, the evidence shows that the defendant was in the Firebird and that the Firebird met with the Taurus and the Camry at Walgreens. We again conclude that this was an overt act in furtherance of the conspiracy, thereby attaching liability to the defendant and that the overt act occurred within one thousand feet of a school zone, thereby triggering the application of the Drug-Free School Zone Act. We also note that the evidence shows that the Taurus and the Camry went to the car wash to complete the drug transaction and that Detective Clark testified that the car wash was within one thousand feet of a school zone. We conclude this was another act in furtherance of the conspiracy Vasquez entered into, attaching liability to him through the provisions of Tennessee Code Annotated section 39-12-103 for the crime and section 39-17-432 for the enhanced penalty. Vasquez is not entitled to relief on this issue.

### E.  Defendant Hector Alonzo

Defendant Alonzo contends the evidence is insufficient because the state failed to prove that he entered into an agreement to possess marijuana with the intent to sell it and failed to prove he committed any overt acts in furtherance of the conspiracy. He claims that the state merely proved his presence at the car wash but that it failed to prove he knew about the drugs or the conspiracy to sell them. The state contends that the evidence is sufficient.

In the light most favorable to the state, the evidence shows that Alonzo was an occupant in the Taurus, that the Taurus parked next to the Camry and Firebird at Walgreens, and that the Taurus and Camry proceeded to the car wash while the Firebird established an observation post at the Burger King. The arrest of the defendants and subsequent search of their cars revealed the presence of over seventy pounds of marijuana in the trunk of the Taurus and the presence of communication devices and weapons. We conclude that the evidence, though circumstantial, is sufficient for a rational trier of fact to find that Alonzo conspired to possess over seventy pounds of marijuana with the intent to sell it.

Concerning the overt act, we conclude that the meeting at Walgreens was an overt act in furtherance of the conspiracy which occurred within one thousand feet of a school zone. We also conclude that the attempt to complete the drug transaction at the car wash was an overt act in furtherance of the conspiracy and that Detective Clark's testimony provided sufficient evidence for the jury to find the overt act at the car wash occurred within one thousand feet of a school zone. Alonzo claims the state failed to prove he committed an overt act in furtherance of the conspiracy. However, Tennessee Code Annotated section 39-12-103 only requires the state to prove that an agreement existed among the defendants to possess more than seventy pounds of marijuana with the

intent to sell it and that any one of the defendants committed an overt act in furtherance of the conspiracy. The state has met its burden, and the defendant is not entitled to relief on this issue.

## F. Defendant Victor Hugo Garza

Defendant Garza contends the evidence is insufficient because the state failed to prove that he entered into an agreement to sell drugs. He asserts that his presence in the Firebird, which he notes was not at the scene of the drug transaction, is "not enough to constitute being a member of a conspiracy." The state contends that the evidence is sufficient.

In the light most favorable to the state, the record reflects that Garza was in the Firebird, that the Firebird was observed at one of the houses on Antioch Pike, that it followed the Taurus to the Walgreens where it met with the Taurus and the Camry, that it followed the Taurus and the Camry to the car wash, but that it stopped short of the car wash, turned into the Burger King, and set up intense surveillance of the car wash. After the arrest order was given, resulting searches revealed the presence of a weapon in the Firebird, over seventy pounds of marijuana in the trunk of the Taurus, communication equipment, and other weapons. We conclude the evidence is sufficient for a rational trier of fact to find that the defendant conspired together with the others to possess with the intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone, and the defendant is not entitled to relief on this issue.

## III. CONSTITUTIONALITY OF THE DRUG-FREE SCHOOL ZONE ACT

Defendants Roberto Vasques and Romero contend the Drug-Free School Zone Act is unconstitutional. They concede that this court has previously upheld the Act's constitutionality under a vagueness challenge. However, they claim that the operation of Tennessee's conspiracy statute in conjunction with the Act, renders the Act unconstitutionally vague as applied to them in this case. The state responds that the defendants have waived this issue for failing to file pretrial motions attacking the constitutionality of the statute, that Romero has waived this issue for failing to raise it in his motion for new trial, and that, in any event, the Act is not unconstitutionally vague as this court has repeatedly held.

The Tennessee Rules of Criminal Procedure mandate that certain motions be raised before trial, including "[d]efenses and objections based on defects in the indictment, presentment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings)." Tenn. R. Crim. P. 12(b)(2). In State v. Smith, 48 S.W.3d 159, 162 n.1 (Tenn. Crim. App. 2000), this court in reviewing the constitutionality of the Drug-Free School Zone Act stated,

> We note the absence from the record of any pre-trial motion to dismiss Count One and Count Two of the indictment on the basis that the Drug-Free School Zone Act is unconstitutional. Tenn. R. Crim. P. 12(b)(2). According to the record, the appellant raised this issue

for the first time at the hearing on the appellant's motion for new trial. We have previously held that, under Tenn. R. Crim. P. 12(b)(2), "defenses and objections based on defects in the indictment," including challenges to the constitutionality of an underlying criminal statute, must be raised prior to trial in order to avoid waiver of the issue. State v. Seagraves, 837 S.W.2d 615, 623 (Tenn. Crim. App. 1992). However, we also note that the State did not raise the issue of waiver at the motion for new trial hearing and does not raise the issue of waiver on appeal. Accordingly, we will address the merits of the appellant's claim. State v. Goss, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998), perm. to appeal denied, (Tenn. 1999).

We note the record reflects that neither defendant raised the constitutionality of the statute by way of pretrial motion and that the state has raised the issue of waiver on appeal. The record also reflects that Romero failed to raise this issue in his motion for new trial. See T.R.A.P. 3(e). The defendants have waived this issue.

## IV. JURY INSTRUCTIONS

Defendant Romero contends the trial court erred by failing to instruct the jury on the lesser included offense of facilitation, arguing that the evidence supported the instruction. The state responds that facilitation is not a lesser included offense of conspiracy because the two crimes contain different elements. In the alternative, the state claims the error, if any, in failing to instruct the jury on the lesser included offense of facilitation was harmless beyond a reasonable doubt given the defendant's primary role in the conspiracy.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies the defendant his constitutional right to a trial by jury. See State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987).

Initially, we note the state did not cite Tennessee Code Annotated section 40-18-110(c) for the proposition that a defendant waives a jury instruction issue on appeal by failing "to request the instruction of a lesser included offense . . . . Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief in a motion for new trial or on appeal." The record reflects that the defendant did not request a jury instruction on the lesser included offense of facilitation of a conspiracy to possess with the intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone.

This court has split as to whether section 40-18-110 violates a defendant's right to trial by jury. In State v. Robert Page, No. W2003-01342-CCA-R3-CD, Shelby County, (Tenn. Crim. App. Aug. 26, 2004), app. granted (Tenn. Jan. 18, 2005), a panel of this court held "the waiver provision of Tennessee Code Annotated section 40-18-110 is an unconstitutional abrogation of a criminal

defendant's constitutional right to have the jury charged on all offenses included within the indicted offense and supported by the proof adduced at trial." However, in State v. Robert Eugene Hall, No. M2003-02326-CCA-R3-CD, Davidson County (Tenn. Crim. App. Feb. 8, 2005), another panel held that "a defendant must request an instruction of the lesser included offense on the record prior to the trial court's charge to the jury; otherwise, the right to appeal the trial court's failure to so instruct is waived." Slip op. at 7 (citing Page, dissenting slip op. at 3). We decline to address the constitutionality of section 40-18-110 because we conclude the plain language of the statute does not preclude us from considering this issue in the context of plain error. See State v. Brandon Patrick, No. E2003-02382-CCA-R3-CD, Blount County (Tenn. Crim. App. Oct. 26, 2004) ("Even when this Court has stated that a lesser included offense issue is waived because of the amended statute, the majority of cases have also addressed the issue on the merits."); cf. Tenn. R. Crim. P. 1, Advisory Commission Comments (stating that the rules of criminal procedure "take precedence over preexisting statutes and case law which are in conflict with them, but statutes passed subsequent to their adoption which conflict with these rules shall control").

Rule 52(b), Tenn. R. Crim. P., provides:

> (b) Plain Error. An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.

See also T.R.A.P. 36(b). Our supreme court

> has developed five factors to consider when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

We note that Tennessee courts have reversed convictions and granted new trials based upon plain error because of the failure to instruct on lesser included offenses even though the issue was not properly preserved. See, e.g., State v. Terry, 118 S.W.3d 355 (Tenn. 2003); State v. Walter Wilson, W2001-01463-CCA-R3-CD, Shelby County (Tenn. Crim. App. Sept. 4, 2002); State v. Jason Thomas Beeler, W1999-01417-CCA-R3-CD, Obion County (Tenn. Crim. App. Nov. 22,

2000). Thus, we will review the defendant Romero's claim on the merits. We will also consider this issue as to the defendants, Roberto Vasques, Kevin Hernandez, and Hector Alonzo under plain error analysis.

In State v. Burns, 6 S.W.3d 453 (Tenn. 1999), our supreme court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser included offense:

> An offense is a lesser-included offense if:
>
> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
>> (1) a different mental state indicating a lesser kind of culpability; and/or
>>
>> (2) a less serious harm or risk of harm to the same person, property or public interest; or
>
> (c) it consists of
>
>> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>>
>> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>>
>> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67. Facilitation in this case is not a lesser included offense under either part (a) or (b) of the Burns test. Under part (c), however, facilitation is a lesser included offense if it is facilitation of the offense charged. In this case the indicted offense was conspiracy to possess with the intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone.

Tennessee Code Annotated section 39-11-403 provides that "[a] person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person

knowingly furnishes substantial assistance in the commission of the felony." The Sentencing Commission Comments to this section state that facilitation is a lesser included offense of the indicted offense. We note that no conspiracy exception exists to this general proposition. T.C.A. § 39-11-403, Sentencing Commission Comments. We conclude that it is possible for a defendant not to have entered into a conspiracy, yet engaged in conduct that facilitates the object of a conspiracy–in this case selling marijuana to the undercover informant. We hold therefore that facilitation of conspiracy to possess with the intent to sell drugs is a lesser included offense of conspiracy to possess with the intent to sell drugs.

If an offense is a lesser included offense, then the trial court must conduct the following two-step analysis in order to determine whether the lesser included offense instruction should be given:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Burns, 6 S.W.3d at 469. Based upon the circumstantial nature of much of the evidence presented at the trial, we conclude the jury could have found that any of the defendants facilitated the conspiracy rather than joined it, and the trial court erred in failing to instruct the jury on the lesser included offense of facilitation of the conspiracy.

We must now consider whether this failure affected a substantial right of each defendant. At the trial, the evidence showed that the undercover informant called his contact, David, and that David then arrived at the car wash in a Camry and met with the informant. The Camry then proceeded to meet with the Taurus, and the Taurus went to the drug houses on Antioch Pike. After retrieving the marijuana, the Taurus left the houses on Antioch Pike followed by the Firebird and both cars proceeded to Walgreens where they met the Camry. All three cars then went to the car wash, with the Firebird turning into the Burger King in order to set up surveillance of the car wash. After the arrest order was given, the defendant Romero was caught fleeing in possession of a handgun. A resulting search revealed the presence of a weapon and communication equipment in the Camry and over seventy pounds of marijuana in the trunk of the Taurus. We also note that no other defendant is named David. We conclude that the evidence against Luis David Romero is overwhelming. It showed not just that he was a conspirator but also that he was a leader in the commission of the offense. We conclude that the error in failing to instruct on the lesser included offense of facilitation did not affect a substantial right of Romero's and was harmless beyond a reasonable doubt.

As to the defendants, Roberto Vasques, Kevin Hernandez, and Hector Alonzo, the informant did not speak directly with them. However, the evidence shows that Vasques, Hernandez, and Alonzo were either riding in or driving the Camry or the Taurus and that they were apprehended at the scene of the attempted drug transaction. We note that Romero was riding in the Camry, that resulting searches revealed the presence of a weapon and communication equipment in the Camry, a weapon on Romero, a weapon near where Vasques was apprehended, and over seventy pounds of marijuana in the trunk of the Taurus, and that Romero and Vasques attempted to flee. Surveillance of the houses on Antioch Pike revealed that after the informant called Romero, Romero met with the occupants of the Taurus, among whom were Vasques and Alonzo. Immediately thereafter, Vasques and Alonzo went to both houses on Antioch Pike and officers observed the Taurus parked behind one of the houses. After the apprehension of the defendants, searches of the houses on Antioch Pike revealed the presence of a large quantity of marijuana and other evidence consistent with narcotics trafficking. We conclude that this evidence overwhelmingly establishes a conspiracy, the object of which was the delivery of over seventy pounds of marijuana to the informant, and the trial court's failure to instruct the jury on facilitation did not affect a substantial right of Vasques, Hernandez, or Alonzo. In this regard, we conclude the trial court's failure to instruct the jury on facilitation was harmless beyond a reasonable doubt and these defendants are not entitled to relief on this issue.

## V. PREJUDICIAL EVIDENCE

Defendants Roberto Vasques and Romero contend that the state violated the trial court's pretrial order prohibiting the state's witnesses from making reference to their ethnicity or place of birth. They claim that Detective Birchwell testified that one or more of the defendants were from Mexico, that they objected, but that the trial court did not correct the error by giving a limiting instruction or an admonishment to the jury. They assert that "[i]n this time period, with so much debate about illegal immigrants and the like, a jury could be swayed by believing that the defendants were illegal aliens." Romero also claims the state's introduction of the possession of weapons into evidence was irrelevant and highly prejudicial. The state responds that Vasques has waived this issue for failing to present it in his motion for new trial, that Romero has waived a portion of this issue by failing to object to the introduction of weapons into evidence or testimony alluding to the defendants as "male Hispanics," that Detective Birchwell's testimony relating to the defendants' nation of origin was relevant and not prejudicial, and that the error was harmless.

We begin by noting that Vasques failed to present this issue in his motion for new trial. The defendant has waived this issue. See T.R.A.P. 3(e). We also note that Romero failed to object to the state's introduction of weapons into evidence or the repeated use of the phrase "male Hispanics." He has therefore waived those issues. See T.R.A.P. 36(a). With regard to Detective Birchwell's testimony, the following portion of the record is relevant:

> Q: Okay. And, you–you mentioned earlier that when their photographs were taken at the booking procedure . . . is that – does that also include finding out where their address is?

A: Yes, sir. You–uh–basically, fill out basic information . . . name, date of birth, address, stuff like that, place of birth.

Q: With regard to Roberto Vasques, uh–does it show whether or not he was from Texas?

A: Roberto Vasques?

Q: Yes.

A: Uh–no, sir. It shows his place of birth as Dallas, Texas, and his address as . . . Dallas, Texas.

Q: Okay. Any other individuals from Dallas, Texas? Would you tell a . . .tell us what was indicated on their booking[?]

A: Uh–Mr. David Romero shows a place of birth in Mexico. . . .

Ms. Thompson: Your Honor, uh–may we approach quickly? I –

. . . .

The Court: Okay. Let's just step in my–my office real quickly and see what this is.

The record reflects that during the proceedings in camera, the defendant argued that the state had violated the trial court's order regarding not introducing any defendant's place of birth into evidence. The state countered that the witness had gone beyond the scope of the question to give the defendant's place of birth as Mexico and that he was only seeking to introduce the defendants' addresses into evidence to show that they were not at the car wash for the purposes of washing their cars. The trial court ruled that the defendants' places of birth were irrelevant but that the state could ask the witness what address each defendant gave the booking officer. We note that Romero did not request the trial court to take any action to cure the witness' answer that Romero was born in Mexico. A defendant must take whatever action necessary "to prevent or nullify the harmful effect of an error." T.R.A.P. 36(a). In any event, we conclude the reference to the defendant's place of birth was not overly prejudicial, and he is not entitled to relief on this issue. See Tenn. R. Evid. 403.

**CONCLUSION**

Based upon the foregoing and the record as a whole, we affirm the trial court's judgment granting coram nobis relief to Luis Martin Vasquez and Victor Hugo Garza but reverse the judgment

as to the other defendants.  We affirm the judgments of conviction for Roberto Vasques, Luis D. Vidales Romero, Kevin Joel Hernandez, and Hector Alonzo.


_____
JOSEPH M. TIPTON, JUDGE